**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Erie County, individually and on behalf of              Case No. 3:11CV00364
   all entities similarly situated,

             Plaintiff

    v.                                                  **ORDER**

Morton Salt, Incorporated, et al.,

             Defendants

      This is a class action suit by fifty-four northern Ohio counties and their political subdivisions, represented by plaintiff Erie County. Plaintiffs allege violations of Ohio's Valentine Act, O.R.C. § 1331.01 *et seq.*, violations of Ohio's Deceptive Trade Practices Act, O.R.C. § 4165.01 *et seq.* (ODTPA), and fraud on the part of defendants. Defendants are vendors of rock salt and hold exclusive leases on Ohio's rock salt mines.

      Plaintiff claims that, due to an agreement between the defendants, they artificially inflated the prices of road salt between 2001 and 2008. Their Valentine Act claim seeks actual damages, trebled under O.R.C. § 1331.08 for the class, declaratory and injunctive relief and the costs and expenses of litigation.

      Plaintiff's second claim is that defendants benefitted from a "Buy Ohio" provision O.R.C. § 125.09, whereby, in exchange for providing Ohio-mined salt, they obtained price enhancements.

However, plaintiff alleges, the defendants engaged in deceptive trade practices by sometimes providing out of state road salt. They seek compensatory damages and injunctive relief.

Plaintiff's third claim is that defendants fraudulently induced the purchase of price-inflated road salt by untruthfully representing that their bids were lawful (when, according to plaintiffs, violations of the Valentine Act tainted their bids). They seek actual damages and costs and expenses of litigation.

Federal jurisdiction exists under diversity of citizenship. 28 U.S.C. § 1332(a).

Pending is defendants' motion to dismiss. [Doc. 24] For the reasons that follow, defendants' motion to dismiss is granted.

## Background

### 1. Buy Ohio

Under the "Buy Ohio" law, state agencies can give bidding preference to providers of products manufactured or mined in Ohio. The director of the Ohio Department of Administrative Services (DAS) sets the criteria and procedures for awarding bids under this provision. O.R.C. § 125.09(C).

Two Buy Ohio requirements are of particular relevance. First, under § 125.09(C)(6) DAS must grant waivers if compliance with the program would result in state agencies "paying an excessive price for the product."[1] . Second, contract awards must be competitive.  If there are two or more qualified bids offering products produced or mined in Ohio, then there is "sufficient competition to prevent an excessive price for the product or the acquiring of a disproportionately

---

[1] The relevant regulation defines an excessive price as one "that exceeds by more than five percent the lowest price submitted on a non-Ohio bid." Ohio Admin. Code 123:5-1-06(C)(3).

inferior product."[2] O.R.C. § 125.11(B). Competitive bidding must, in any event, still result in a price that is not excessive for the agency receiving the bids.

## 2. The Ohio Department of Transportation's
## Lockout Interpretation

The Ohio Department of Transportation (ODOT) generally has independent purchasing authority. O.R.C. § 5513.01. This independent authority does not, however, extend to the purchase of rock salt. Instead, ODOT must receive a Release and Permit from DAS in order to award a contract to a provider of out of state salt. From 2001 to 2008, ODOT did not follow this procedure. Instead it purchased rock salt independent of DAS.

ODOT interpreted the requirements of Buy Ohio differently than DAS. The Buy Ohio law requires awarding a contract to a provider of Ohio produced or mined products where the provider's contract price does not exceed the price offered by a bidder offering out of state products by five percent.

---

[2] This General Assembly revised this regulation, effective June 29, 2011, to now read:

Prior to awarding a contract under division (A) of this section, the department of administrative services or the state agency responsible for evaluating a contract for the purchase of products shall evaluate the bids received according to the criteria and procedures established pursuant to divisions (C)(1) and (2) of section 125.09 of the Revised Code for determining if a product is produced or mined in the United States and if a product is produced or mined in this state. The department or other state agency shall first remove bids that offer products that have not been or that will not be produced or mined in the United States. From among the remaining bids, the department or other state agency shall select the lowest responsive and responsible bid, in accordance with section 9.312 of the Revised Code, from among the bids that offer products that have been produced or mined in this state where sufficient competition can be generated within this state to ensure that compliance with these requirements will not result in an excessive price for the product or acquiring a disproportionately inferior product.

O.R.C. § 125.11(B).

During the period in question, ODOT ignored the five percent limitation. As a result, Buy Ohio became a lockout provision for ODOT. If at least two companies bid to provide Ohio-mined rock salt, ODOT took those bids to be "sufficient competition". On that basis, ODOT rejected bids for non-Ohio rock salt, leaving ODOT to choose only among available Ohio vendors. *Id*.

Ohio's two underground rock salt mines are under Lake Erie: one in Cleveland, and the other in Fairport. Ohio leased the the Cleveland mine to Cargill and the Fairport mine to Morton in the late 1950s for 100-year terms. Because of these lease agreements, Cargill and Morton are the only companies mining Ohio rock salt. When the two companies bid to provide rock salt to ODOT, those bids locked out all -competitors providing salt mined elsewhere.

### 3. Ohio's Rock Salt Purchases, 2001-2008

ODOT runs a cooperative purchasing program for local governments, allowing those entities to purchase goods through ODOT. Suppliers bid on a county-by-county basis for both ODOT and local governments. The rationale behind this process is transportation costs: vendors may have different costs depending on the location of a county and its and ODOT's salt depots.

Ohio's rock salt market consists of two distinct markets: north and south. The north market encompasses the fifty-four counties in the plaintiff class. The south market is Ohio's other thirty-four counties. Cargill and Morton and fulfill contracts in the north market with Ohio-mined salt. They and other providers deliver out-of-state salt to satisfy contracts in the south market.

Between 2001 and 2008, ODOT's misapplication of Buy Ohio left Cargill and Morton as the only bidders for rock salt contracts in the north market. During that time, the companies maintained largely stable and unusually profitable market presences in the north market.

### 4. Ohio Inspector General Investigation

4

In 2009, the Office of the Inspector General of Ohio (OIG), at the direction of Governor Ted Strickland, began investigating ODOT's road salt purchasing practices. On January 6, 2011, that office issued its Report detailing the OIG's findings. [Doc. 24-2]. That Report is the source of the preceding facts.

The Report focused on the source of high rock salt prices in Ohio, placing blame on ODOT, Cargill and Morton. The Report alleged five indicators of an anticompetitive marketplace based on statistical analysis:[3]

1. **Stable market shares.** Morton and Cargill maintained largely stable market shares during the period ODOT was causing the lockout of other bidders.

2. **High incumbency.** Morton and Cargill frequently won the same customers year after year, with little switchover.

3. **Suspicious bidding patterns.** Morton and Cargill, when non-incumbent, would frequently fail to make competitive bids even if they were providing service in a bordering county or within the county itself.

4. **Sham or complementary bids**. Morton and Cargill, when non-incumbent, would bid amounts that did not appear to correspond with any market indicator of actual cost. Those bids would ensure that the incumbent company kept its contract each year.

---

[3] The Report relied on the analysis of Dr. James T. McClave, a professional statistician whose company, Info Tech Inc., has developed statistical software for detecting collusive behavior in sealed-bid markets.

5.    **Unusually high profit margins**. Morton and Cargill's average profit margin on contracts in the north market was markedly higher than in counties in the south market and states without lockout provisions.

In addition to the preceding facts, the Report found that Cargill and Morton improperly substituted non-Ohio salt dozens of times in its deliveries to ODOT, and that ODOT officials received gratuities of questionable propriety.

The Report stated, however, that the OIG had "failed to find evidence that [Cargill and Morton] communicated on salt bids." [Doc. 24-2 at i].

### 5. Prior Proceedings and Rulings

Plaintiff Erie County filed this suit on January 20, 2011, in the Court of Common Pleas of Erie County, Ohio.. Defendants filed a Joint Notice of Removal to Federal Court on February 18, 2011. Plaintiff filed a First Amended Complaint on April 11, 2011, and defendants replied with a Motion to Dismiss on May 2, 2011. Plaintiff filed a Second Amendment Complaint on August 4, 2011, to correct certain data recited in earlier complaints. Each complaint alleges violations of Ohio's Valentine Act, violations of Ohio's Deceptive Trade Practices Act, and fraud.

### Standard of Review

A claim survives a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*,   U.S.  , 129 S. Ct. 1937, 1949 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint's "[f]actual allegations must be enough to raise a right to relief

6

above the speculative level, on the assumption that all of the complaint's allegations are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

A complaint is insufficient "if it tenders naked assertions devoid of further factual enhancement." *Iqbal*, *supra*, 129 S.Ct. at 1949 (citing *Twombly*, *supra*, 550 U.S. at 557) (internal quotation omitted).

I must "construe the complaint in the light most favorable to the plaintiff." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). Plaintiff, however, must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, *supra*, 550 U.S. at 555; *see also Iqbal*, 129 S. Ct. at 1949 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

## Discussion

Defendants contend that plaintiff has failed to: 1) adequately allege the facts necessary to render their price-fixing claim plausible under the *Twombly/Iqbal* standard, 2) adequately allege the facts necessary to render their deceptive trade practice claim plausible under the *Twombly/Iqbal* standard and 3) meet the heightened pleading standard of Fed. R. Civ. P. 9(b) in its fraud claim.

## 1. Price-Fixing

Ohio's Valentine Act, O.R.C.§§ 1331.01-.14, prohibits "conspirac[ies] against trade", including "establish[ing] or settl[ing] the price of an article, commodity, or transportation between them or themselves and others, so as directly or indirectly to preclude a free and unrestricted competition among themselves, purchasers, or consumers in the sale or transportation of such article or commodity[.]" *Id*. §§ 1331.04, 1331.01. The Valentine Act replicates the Sherman Antitrust Act,

15 U.S.C. §§ 1-7. Ohio courts interpret the Valentine Act in light of federal judicial construction of the Sherman Act. *See, e.g., Johnson v. Microsoft Corp.*, 106 Ohio St.3d 278, 281 (2005).

The threshold question for a claim under the Sherman Act is whether "the challenged anticompetitive conduct "stem[s] from independent decision or from an agreement, tacit or express[.]"" *Twombly*, *supra*, 550 U.S. at 553 (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)). To find an agreement, the defendants' conduct "must tend to rule out the possibility that the defendants were acting independently[.]" *Id*. at 554. Mere "parallel conduct [with] a bare assertion of conspiracy" is insufficient to raise a claim of anticompetitive conduct from speculative to plausible. *Id*. at 556. The pleading thus must allege "a preceding agreement, not merely parallel conduct that could just as well be independent action[.]" *Id*. at 556.

A court may infer an agreement either from direct evidence of an agreement or from parallel conduct plus additional facts plausibly raising the prospect of illegal agreement. *LaFlamme v. Societe Air France*, 702 F.Supp.2d 136, 146 (E.D.N.Y. 2010) (quoting *Twombly*, 550 U.S. at 556-57). The additional facts must "tend[. . .] to exclude independent self-interested conduct as an explanation for the parallel actions." *Twombly*, 550 U.S. at 544. Either way, at the pleading stage there must be a "reasonable expectation that discovery will reveal evidence of illegal agreement." *Id*. at 556.[4]

---

[4] I note that this case is somewhat unusual in that the OIG's investigation involved *duces tecum* subpoenas that produced upwards of 300,000 pages of documentary evidence and interviews with twenty-seven witnesses. Thus the plaintiff, even if it did not have access to these materials (which the record does not disclose one way or the other), has the benefit of the work product (namely, the OIG Report) based on that discovery. The Report is the exclusive source for the complaint and provided all the pertinent evidence which plaintiffs recite in that pleading.

The plaintiff need not meet the summary judgment standard at this stage. *In re Packaged Ice Litigation*, 723 F.Supp.2d 987, 1004-05 (E.D. Mich. 2010). Nor need the plaintiff plead the "who, what, when and where" of conspiracy in order to overcome a Motion to Dismiss. *In re Southeastern Milk Antitrust Litig.*, 555 F.Supp.2d 934, 943-44 (E.D. Tenn. 2008). What is required, however, is something more than the hypothetical construct of a conspiracy. The pleading must contain sufficient factual allegations to give the defendant some idea of "how to begin to respond to the allegations of a conspiracy[.]" *Packaged Ice Litigation*, 723 F. Supp.2d at 1007.

### A. Plaintiff's Evidence of Direct Agreement Between Defendants

Plaintiff alleges that defendants "creat[ed] a duopoly and effectively communicat[ed] regarding their anticompetitive objectives." [Doc. 31, at ¶ 23]. Plaintiff later alleges "Defendants agreed to bid more aggressively for certain entities, including Plaintiff herein, while bidding less aggressively for others." *Id*. Plaintiff also alleges "multiple instances" of Cargill letting Morton win certain markets. *Id*.

Plaintiff admits a "lack of direct evidence of communication" between defendants. *Id*. The OIG Report "failed to find evidence that [Cargill and Morton] communicated on salt bids[.]" [Doc. 24-2 at i]. Plaintiff alleges, therefore, no direct evidence of an agreement between defendants.

### B. Plaintiff's Evidence of Parallel Conduct

Cargill and Morton benefitted from a gross and persistent interpretive error by the Ohio Department of Transportation. As the only holders of leases for Ohio's rock salt mines, Cargill and Morton enjoyed duopoly status *vis-a-vis* rock salt sales to the state and local political subdivisions, including all members of the class, needing rock salt to keep their roadways safe. As a result of this

9

structure, the market was inherently anticompetitive. The five indicators of that competitive deficit noted in the OIG Report make this fact clear.

During this time, Cargill and Morton bids exploited the anticompetitive nature of Ohio's rock salt market. Plaintiff alleges these bids were evidence of something more insidious, and that this parallel conduct is evidence of an agreement between the parties to fix the price of rock salt in Ohio.

I believe that defendants' actions are at least as likely to be those of independent beneficiaries lawfully exploiting ODOT's erroneous anticompetitive interpretation as they are of unlawful conspirators in that same marketplace. Metaphorically, they he took their own shares of the manna that kept falling from Heaven. Plaintiff has shown parallel conduct and paired it with the bare allegation of conspiracy *Twombly* prohibits.

It was to each defendant's economic benefit to maintain the status quo. The marketplace's dysfunction guaranteed each company significant profits if each stuck to its own territories and helped itself only to its portion of the manna. Cargill and Morton were the only competitors each had to fear; by not provoking a bidding war, each company ensured itself of steady and maximum profits within a protected sphere. As defendants point out, any entry by one company into a county the other held could provoke "an aggressive counter-response from the other firm in *another* county - something that would interfere with the firm's ability to charge higher prices." [Doc. 24-1, at 12].

The Department of Transportation gave Cargill and Morton an oligopoly. The defendants, in turn, exploited that closed and concentrated market, and at the very least engaged in conscious parallelism to "set[. . .] their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions[.]" *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993).

10

But that, in and of itself, is not sufficient to maintain this claim without additional facts. *Id*.; *see also* *Twombly*, *supra*, 550 U.S. at 556-57.

The indicators of an anticompetitive marketplace alleged in the OIG Report do not alter this analysis. The indicators describe at length signs of an anticompetitive marketplace, but do not provide indicia of illegal collusion within that marketplace.

Plaintiff has not presented a sufficient set of facts that enable this claim to survive the motion to dismiss. There is no plausible inference of an agreement between defendants, either through direct evidence of communication or evidence of parallelism plus additional facts. Some inference of an agreement is necessary for the claim to remain viable. Without any evidence of one, I must dismiss the claim.

### 2. Deceptive Trade Practices

Plaintiff alleges violations of O.R.C. § 4165.02(A)(2), prohibiting the causation of "likelihood of confusion or misunderstanding as to the source . . . of goods or services" and O.R.C. § 4165.02(A)(4), prohibiting the "[u]se . . . [of] deceptive representations or designations of geographic origin in connection with goods or service" by defendants. Section 4165.03(A)(2) permits civil actions and recovery of actual damages by "a person who is injured by a person who commits a deceptive trade practice" contained in Ohio Rev. Code § 4165.02(A).

The basis for this claim is the OIG Report, *supra*. Buy Ohio required that the salt received from Cargill and Morton through the ODOT purchasing program be mined in Ohio. The Inspector General's investigation revealed a substantial likelihood that salt received by ODOT for state use was mined elsewhere, due to lax salt segregation procedures. [Doc. 24-2, at 34]. The Report alleges that the out-of-state salt was delivered to "ODOT's storage site," which housed salt purchased by

11

the state for state use. *Id*. at 31. It specifically alleges 115 instances of substitution in ODOT deliveries on the part of Cargill and seventeen instances of substitution on the part of Morton. *Id*. at 34, 37. Plaintiff alleges no further facts in support of its claim.

## A. Plaintiff's Standing

Standing to bring a suit is an "irreducible constitutional minimum." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The first criteria of standing is an injury in fact. An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Id.* (citations omitted).

Plaintiff alleges that defendants providing non-Ohio salt to ODOT constitutes an injury, in part, because "[O.R.C. §] 4165.03 dictates no single way to be injured by deceptive trade practices[.]" [Doc. 25, at 17]. Despite lacking a specific definition of "injury," Ohio's Deceptive Trade Practices Act is still subject to the constitutional requirement of standing.

Plaintiff claims its injury in fact stems from its reliance on defendants' misrepresentation of non-Ohio salt as Ohio salt. The misrepresentation allegedly led to an improper award of rock salt contracts, and in turn cost plaintiff extra money by shutting out other and presumably cheaper vendors.

To prove a misrepresentation, someone must misrepresent something. Someone else in turn has to be "misled, deceived or confused" in order to find an offending party liable. *Lozier v. Kline*, 40 Ohio App. 2d 277, 282 (Ct. App. 1973). Plaintiff has not pointed to any misrepresentation constituting an injury in fact. Instead, plaintiff insists that it has an actual, concrete and particularized injury because the State of Ohio claims that it had a separate actual, concrete and particularized injury stemming from separate transactions.

12

The injury alleged is entirely conjectural. "It happened to them, so it must have happened to us" is neither concrete nor particularized, and does not even leave me with a particular transaction or set of transactions as a hook on which to hang this hypothetical hat.

Because the injury alleged is hypothetical, rather than actual, plaintiff lacks a suitable injury to maintain standing for its Deceptive Trade Practices Act claim.

### 3. Fraud

Plaintiff contends that defendants have committed fraud as a result of their "false and misleading" "anticompetitive bidding process" and "product-substitution practices[.]" [Doc. 25, at 19]. An allegation of fraud "must state with particularity the circumstances constituting fraud or mistake[.]" Fed R. Civ. P.9(b). Specifically, an allegation of fraud must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent[.]" *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir.2008) (internal quotation marks and citations omitted).

Plaintiff alleges no statement on the part of either defendant. It identifies no specific speaker. It does not give a location, date or time for any statement. Plaintiff simply rehashes its other claims and calls them fraud.[5]

---

[5] Plaintiff argues:

Complaints that do not answer the specific questions of "who, what, when and where" may still comply with the pleading requirements of *Twombly* and Rule 9(b) if the allegations "put defendants on notice concerning the basic nature of their complaints against the defendants and the grounds upon which their claims exist" and "adequately state facts which address the questions." *In re Southeastern Milk Antitrust Litigation*, 555 F. Supp.2d 934, 943 (E.D. Tenn. 2008).

[Doc. 25, at 19].

13

Plaintiff has failed to properly plead the heightened factual basis for fraud, and this claim cannot survive a motion to dismiss.

### Conclusion

Plaintiff has failed to plead a sufficient factual basis for any claim contained within its second amended class action complaint.

For the foregoing reasons, it is hereby:

ORDERED THAT: defendants' motion to dismiss the second amended class action complaint [Doc. 24-1] be, and the same hereby is granted.

So ordered.

S/James G. Carr
James G. Carr
Chief Judge

---

This is a misreading of both the *Twombly* decision and Rule 9(b). The Rule of Civil Procedure at issue in *Twombly* is Fed. R. Civ. P. 8(a)(2), requiring "only " a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests[.]"" *Twombly*, *supra*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Rule 9(b) is a separate rule requiring a heightened pleading standard, and was not addressed or altered by *Twombly*. *Id*. at 576 n.3.

14